Thank you. Case number two is number 24-10231, Coakley Pendergrass v. Secretary, State of Georgia. Ms. Khanna. Good morning, Your Honors. And may it please the Court, Abba Khanna on behalf of the grant plaintiffs. And as I think this Court is aware, I will also be arguing on behalf of the Pendergrass plaintiffs in the next scheduled argument. Okay, we have – it doesn't really matter because you're all here for the same thing. Which one are you going to do first, the Pendergrass or grant? I have scheduled to do grant first because that's how the calendar is. I think, frankly, Your Honor, a lot of the – I have a different calendar, but that's okay. Do you – Is that it? I'm good with either, Your Honor. It doesn't – I think ultimately – It doesn't matter to you which order they go in? It does not matter to me. Okay. Thank you for that. And which one are we going with first? Why don't we go with Pendergrass first then? We'll go with the congressional, as expected. I think, Your Honor, I find that these are angels on ahead of a pin because the same fundamental legal error is what we are challenging in all of these maps.  Sorry for that. Sorry to time over again, please. Thank you, Your Honor. This case – these cases, Your Honor, are about the thousands upon thousands of black voters who were found to have suffered a vote dilution injury in violation of Section 2, a violation of their Section 2 rights, but failed to achieve any Section 2 remedy. The same question I asked before, and I'll keep asking, just to get a lay-of-the-land perspective. Pendergrass are the congressional districts, right? Yes. Okay. Tell me what existed with regards to black-majority congressional districts in the 21 plan and what changed or didn't change in the 23 plan. Your Honor, in the congressional case, they did a plus-one majority black district that did not exist in some parts of that area. That is true. So they have met that plus-one rule. If that were the end of the remedial inquiry, then that would be a much simpler – this would be a much simpler case. And fortunately, or factually fortunately, the 11th Circuit and the Supreme Court have said that that's – we're not going to just – we are actually not going to allow the state to reduce this entire remedial inquiry, years of a Section 2 violation, to a simple math problem. That's a little too cute. We know that the court has basically said you have to eschew the idea that we look at general areas to make sure the math kind of adds up and then call it a day. The court said specifically that in LULAC. In LULAC v. Perry, there was a region, there was an area, a vote dilution area, specifically around what was CD23 in the Texas map at that time. And the Texas legislature, and you'll see even in many of several of the dissents in LULAC v. Perry, were like, come on, you know, it's all in this general region. And we added a district, so the dilution is – you got your plus one, and isn't that enough? And the Supreme Court majority said absolutely not, because you are not allowed to suggest – the black voters are not fungible. The black voters who have a Section 2 right, who experienced and suffered a Section 2 violation, are entitled to a Section 2 remedy. And that violation is not solved by swapping out the rights of people who don't have a Section 2 violation, who don't have a Section 2 right, with the minority voters who do have a Section 2 right. And that is exactly the nub of the problem. They did not remedy the problem for the voters who experienced a Section 2 violation. Why not? Well, precisely the ways that they laundered black voters between and among districts deftly to create the illusion of new opportunities without actually creating them, the reason that they did that, Your Honor, and so – Tell me why the voters who had the Section 2 violation in this report did not have that violation remedied. Because what we showed is that there are over 50,000 black voters who the district court found experienced a violation. And rather than – and the legislature, rather than creating a remedial district that actually drew black voters from a vote dilution area, it said, you know what, you 50,000 plus, you're not going to get a remedy. Instead, I'm going to go somewhere else and find 50,000 other black voters and put them in this district and call that a remedy. And the end result is plus one, so that's enough. Explain that to me again. Sure. You're saying that there were 50 – to use your number, 50,000 black voters who had a Section 2 violation, right? There were a number of black voters that had a Section 2 violation. More than 50,000 of those, primarily in West Douglas County, the westernmost part of this area, did not realize a remedy. Okay. Where are those voters now? Those voters have been drawn into a district, a newly configured District 7 that is a majority white district that connects up with north and east Georgia. So you're right, Your Honor, to say. I don't want to suggest that the legislature is so constrained that – I'm not saying that every single black voter in the vote dilution area gets to be in a majority black district. The courts – we know that's not a numerical possibility. The courts have acknowledged that that's not true. But it is absolutely fair to say that the remedy district should draw from blacks. You can even say exclusively from the black voters in the vote dilution area. What they certainly cannot do is opt not to give those black voters a remedy because they've chosen to give other black voters a quote-unquote remedy. And those other black voters never needed or required or proved the need for a remedy. Right? They cannot exclude the rights of those who have suffered the violation. And as the court already said in LULAC, they cannot trade off the rights of those who suffered a vote dilution injury by swapping in those who didn't. Now, you heard my opposing counsel talk about LULAC and really tried a cabinet. And I am not surprised. I don't – I understand why he would want to do that because LULAC is a very bad case for that. LULAC is the one that dispels, I think, the entire notion that we can look at these districts in generalities or look at these regions in generalities and that we can do simple anaesthetic to say how many majority black districts are there and can we call it a day. What LULAC said, what my opposing counsel noted, was that LULAC recognized you can't just decide plus one is enough if the people I'm giving that plus one to have no Section 2 right. Now, in LULAC, they had no Section 2 right because they were not in a compact area. Here, the ones that they've chosen to pull in to this quote-unquote remedial district had no Section 2 right because they never had their vote diluted in the first place. If I had tried to bring a Section 2 claim on behalf of those voters, I would have lost because they are already in districts where they can elect their preferred candidates. The reason why they had no Section 2 right is irrelevant. The most relevant fact is that the people who actually did have a Section 2 right and that is not in dispute in this posture on remedy, they didn't get it. And what could possibly be the reason to do that? Specifically in the congressional map, the over 50,000 voters in that vote dilution area whose rights were—sorry, the over 50,000 voters who came in from outside, that alone is not the violation. The violation that those voters came in to the exclusion of the rights of voters in the vote dilution area. Your theory is right. What's the baseline for effective remedies? The baseline for— Let's use 50,000. I know it's a rough number. Yeah. So let's use 50,000 as a sort of starter baseline. Yeah. If you had 50,000 black voters in a certain area of metro Atlanta who had the Section 2 violation, how many of them could you leave out and still have an effective remedy? It's not about an effective remedy. It's about a full and complete and lawful remedy that is as near— These are the words. As near— How many could you keep out? I see no reason to keep any black voters out. I have a question to you. I think the answer is technically zero, Your Honor. So they have to have every single one of those. Again, using 50,000 as a rough number, you have to put all of those in a black majority district. You can't— Not every single black voter in the entire vote dilution area has to be in a black majority district. That is true. But to the extent you are going to exclude an opportunity from people within the vote dilution area, you can't— Sorry. To the extent you're going to include people from outside, you can't do so at the exclusion. So they are not prohibited from bringing people from outside into the majority black districts, but they are prohibited from doing it at the expense of the voters in the area who suffered the violation. Same question. What numbers— If you're asking about, would 10,000 be enough? Would one voter be enough? Unfortunately, or fortunately, Your Honor, there's no legal standard that says there's a threshold number. You can't run away from that question. Because if the district court had said, you have to have a remedy that encompasses 40,000 of those 50,000, then you've got to put at least 80% of those voters into a black majority district. Would there be a Section 2 remedy problem? And they did that. Would there be a Section 2 remedy problem? See, we have to write an opinion— No, I understand. And I understand entirely. Which is why I'm going to— For you, it's a zero-sum game. I think that, honestly, Your Honor, I don't— I can—I think that any— I certainly think 50,000 is not de minimis. And while cases like— I'm not suggesting it is. So while cases— You're saying you can use whatever number you want. You can use 500,000. I want to know, give me a safe harbor provision where you can leave a certain slice of the affected voters out and not have a Section 2 remedy problem. I don't actually— The reason I'm not going to give that safe harbor and the reason that the Supreme Court and the 11th Circuit have not given that safe harbor is because while they might— while they've recognized that there might be some inevitable mathematical problem that means that not every single individual black voter in a vote dilution area gets to be in the district, I think we can fairly say that when you are drawing a remedy district, it should draw from the black voters whose votes have been diluted. Not all. It can't be all of them. But it's got to be drawn from there. And to the extent you're including other people, it can't be to the exclusion of those. So I think as a conceptual and a theoretical matter, Your Honor, I think the answer to your question is zero. And I think ultimately the reason why the kinds of— I understand the Court's motivation to try to figure out, like, what's the right number? Would this have been okay? Would this have been okay? These are all questions that the district court was required to ask in holding the State to account to decide whether that remedy was, in fact, full and complete and fair and as near as possible as it could have been, rather than what it did, which was basically back off from holding the State to account and overly defer, as if this were a liability ruling times two, when in fact on remedy that deference is constrained and the district court's interrogation of who exactly— not just about the simple arithmetic, but who are the voters? And are those voters' vote dilution injuries being remedied? Can you tell me what was the number here? Mr. Savitsky said that with respect to the Senate districts, under the remedial plan, there was an increase of only less than 0.5 percent. What was the number in this case? There is an increase in the West Metro Atlanta area, as in the vote dilution area, of people who are now in a majority black district who weren't before in the 2021 map. However, the increase is not— that remedy, while it might be a plus one on paper, is not a full, complete, as near as possible remedy, which is the court's standard. These are not just platitudes. Because it consciously, studiously, avoids providing a full remedy to as many of those voters as possible for the very purpose of dismantling other opportunities elsewhere. This court does not even have to deal with that part of the claim. Whether the state has an independent right to dismantle opportunities elsewhere is an entirely different part of our claim. Fundamentally and most importantly, it absolutely cannot do so to the exclusion of the rights that need to be remedied, who have a right and who have a violation. Does that answer your question, Your Honor? Well, you still didn't give me a number. Oh, the actual number of how many more black voters? Let me try to be precise about that. In the 2021 map, there were five 21 districts, five 2021 districts, that are in the vote dilution area. And out of those, 383,000 approximately, I can give you this more granular number, 383,000 live in a majority black district. In the 2023 map, 600,000 live in a majority black district. However, the only way that they got to that higher number was by pulling in black people who already had opportunities elsewhere and putting them into this district and taking out black voters who had the remedy, who had a right and had a violation and didn't have a remedy. So while it is a net increase from the 2021 map, it is a subpar increase compared to the illustrative map and compared to any number of opportunities they could have drawn in a way that actually remedied the vote dilution area. Whatever else their political preferences are, however else they want to treat voters outside the vote dilution area, they cannot do any of those things at the expense or over the priority of actually remedying the voters in that area. How much of that 2,000 to 300,000 person increase was from the vote dilution area? Well, I believe that we can say 20% was from outside the vote dilution area. We say 25% of the new CD6 came from CD5, which is outside of the vote dilution area. These are not de minimis or individual numbers. This is not about the people in Shaw who say they have no individual right to be any specific voter in any specific district. This is tens of thousands of meaningful, substantive black voters who experienced a violation who will not see a remedy under this map. Thank you, Your Honors. Good to see you again, Your Honors. Judge Stroud, to start with the question you had asked both times, previously there were two black voting age population, majority black districts, now there are four. So there is an additional one in West Metro Atlanta, but we actually also created another one because some of the numbers were pretty close. And it's rare that opposing counsel gets up and proves everything you just said to be correct, but that's what just happened. The plaintiffs want a revolution in Section 2. They do not want to go with what the cases say to this point. Opposing counsel said, well, if all this were about is what is the number of districts, and are they in basically the right area, and then we're done, sure, this would be an easy case. That's exactly what this case is. Are they the right number of districts? Yes. Are they in basically the right area? Yes. That is the end of this case. You can't prove a Section 2 violation in these maps because you can't draw another one. Slow down, slow down. We'll give you enough time. One of their arguments is none of those. One of their arguments is however the legislature crafts the remedy, it cannot craft a remedy that completely excludes the voters who had a Section 2 problem in the first place. I'm not saying that's right or wrong, but that's the premise of the argument, that the legislature did that and that the legislature can't do that. Can you respond? Yeah, first of all, that's not what happened, and second of all, the legislature can absolutely draw districts that leave out black voters who challenge... Every Supreme Court case on Section 2 says you do not have a right to be in a majority black district. What my opposing counsel just said is yes, we do. Their argument, I think, and Ms. Connick can correct me when she gets back up, I think is a broader one. Their argument factually here is that they were completely left out. So I think she accepts in theory your position that under the relevant cases, not everybody who was subject to a Section 2 vote dilution violation needs to have or be in the remedial district that's created afterwards. But her point is you can't exclude everybody. So to use 50,000 as a hypothetical figure, if you had 50,000 black voters whose votes were diluted, the remedy cannot exclude every single one of them. That's my take of the argument, and the one I'd like you to respond to, both factually and legally. So legally speaking, first of all, I did not take that to be her argument because she said you can never leave somebody out when you're bringing somebody else in who supposedly does not have a Section 2 right. I don't know what that means. First of all, everyone else that we're talking about here does have a Section 2 right. But any time you leave somebody out, you're going to be bringing somebody else in. So legally, it cannot be that we have to put every single black voter in every district they happen to challenge into a black majority district. But also, as a practical matter, the normal... She said you can't leave everybody out. Well, Your Honor, I mean, candidly, we obviously didn't leave everybody out. Even opposing counsel is not saying that. I mean, basically, if you look at these districts, if you look at our district as compared with their illustrative districts, they're very similar. The population for a congressional district is roughly 670,000 people. And so when they're saying, oh, you left 50,000 people out, that's, like, less than 10% of a single district. I mean, again, I do not accept for a moment we have to care about that. What's the number again for a congressional district? It's roughly 670, somewhere around. I mean, I might have that number off by 1,000 or 10,000, but it's roughly in that area. That's my understanding, yes. Yes, yes, yes. And so you're talking about even under their own way of looking at this, which, again, no court has ever looked at it like this. Even under their own way of looking at this, you're talking about a very small percentage. But again, I just want to go back to... I said when I was first up here that every single one of their arguments is just trying to circumvent Strickland, and everything she said was just an attempt to circumvent Strickland. The entire argument here is, well, these other black voters do not have a Section 2 right because they're in crossover districts. That's not right. They do have a Section 2 right. Crossover districts are not a Section 2 cognizable thing. They don't matter for Section 2, at least at the jingles prerequisite stage. So if you were to challenge these districts and say we could draw more black majority districts, you would fail. If you were to challenge them and say we could draw more crossover districts, you would fail. And if you're going to fail under jingles, you can't possibly have failed when the district court looked at this and said, yeah, this is what I asked you to do. And I want to get to a point on LULAC. I am happy to talk about LULAC. LULAC is an excellent case for us. It disproves everything the plaintiffs are talking about. This was not a question of, oh, the district wasn't quite where it was supposed to be. This was a question of, are you on the West Texas kind of Mexican border? No, you drew a district that's 300 miles long to get to a totally different city. Again, the analogy would be us drawing a district from Atlanta to Augusta. The only response I've heard on that is this notion that, well, Atlanta has so many people, it's basically the size of, say, North Carolina and Shaw or something like that. But there are two huge problems with that. One is the problem in Shaw, again, was that it wasn't compact under any understanding of compactness. And two, in both Shaw and LULAC, the court could not have been clearer. When we're talking about compactness, when we're talking about Section 2 regions, we're talking about geography. That's what we're talking about. And the idea that Atlanta, that all these black majority districts, all of which touch each other, all of which you move one, another thing is going to move as well, the idea that that is not all one region for the purposes of Section 2, I mean, that is not only factually hard to believe, but there's nothing legally that would suggest that that's the case. And so all of the, again, this just gets back to all of their arguments come down to, we don't like the fact that in order to create additional black majority districts, you didn't keep going west or keep going south to pick up largely white voters, that's really the ones they want in the district, so the Republican white voters, that is not the sort of thing that the state has to give up on in remedying a Section 2 violation. And again, I'm not going to take up more time than I need to, but on liability, we said across the board, we should not be liable because we have all of these districts that are electing, you know, black preferred candidates, black candidates, et cetera, even if they're not black majority. And the district court said, nope, all that matters is the black majority districts. We cannot possibly now be getting it essentially on both ends where it's like, well, now you have to worry about those districts. Now you're not allowed to say, oh, these black voters are also newly in a black majority district because previously they were in a crossover district. That doesn't make any sense at all. So I think all of these arguments are just trying to get around Strickland, they're trying to get around the fact that these other areas are contiguous with the districts that we're talking about, and they're trying to get around the fact that we did put these districts in South and West, we just didn't go quite as far South or quite as far West as they wanted to. And the idea that the district court abused its discretion and clearly erred in holding other, in finding otherwise, I think has no purchase. One final point before I'll sit down again, unless Your Honors have more questions. This notion that we changed the numbers, that we changed the numbers to align with the plaintiff's numbering of the black majority districts. This is undisputed. The district court understood this. This is in the record. The only reason we changed the numbers on the new districts from kind of what the numbers normally would be in that area is because in the plaintiff's maps, they use numbers like, I think it was 117, 74, 17, 28. And so to make it easy for the district court to read it, those were the numbers that we used. But this notion that it was some sort of a, some part of like some scheme, just not borne out by reality. I will have another 15 minutes, so I'm happy to sit down now unless you have any immediate questions. Yeah. So in the October 2023 order, the district court said it was retaining jurisdiction to evaluate the remedial maps. And then it said that it would determine whether the remedial plans provided a complete remedy in the Section 2 violations, which will require the court to evaluate a remedial proposal under the Jingles standard. Did the district court do that after the remedial maps were passed? Yes, I think so. I mean, I think what the district court was doing was saying this is now a new black majority district or these are now two new majority black districts. And the reason it didn't have to go too in-depth on the analysis there is no one can test it. These are all compact Jingles districts and you can't draw any more of them. So I think that basically the district court was just making the point that if when you give me a remedial map, it satisfies Jingles, well, then you're done. I mean, there's nothing else to be done. I don't know how you could have a remedial map that satisfies Jingles and does not otherwise satisfy a remedial order. There is a line between making sure that the remedial map doesn't self-violate section two, right? And addressing the claims of new voters, new individuals that now their rights have been adversely affected by the new remedial map. The district court generally said to the extent that these other groups are now raising different sorts of claims, they should basically file a new lawsuit because that's going to require a new trial, et cetera. But there is a general obligation on the part of a district court, I think, to make sure the remedial map does not itself violate section two. So what's the line between those two extremes? Two points on this, Your Honor. The first is when the district court was talking about there was this, at the time, the district court understood and we understood to be essentially a new claim from plaintiffs that we had violated section two by removing a coalition district on the congressional map. And what the district court said was this entire thing has never been about coalition districts. We have no evidence on coalition districts. You haven't put in any evidence on coalition districts. So, no, you can't raise that particular claim right now. You would have to try that somewhere else. You would have to, you know, start a new action. But isn't there something to the notion that a new plan is going to necessarily require new evidence to make sure it applies to section two? And the district, it may be a quick look, but the district court's going to have to take a look at the objections even though they're new in nature, right? Yes, and I think that's what the district court did, Your Honor. What the district court said was you have put in no evidence at all for me to address this. Not literally no evidence, but essentially no evidence. I mean, the only evidence that they really put in for this coalition claim, which, by the way, we think as a matter of law it just fails. There is no such thing as a coalition district claim under section two. But even if you were, you know, inclined to, you know, think about the idea, there's nothing suggesting, we have literally no evidence that the black, Latino, and Asian voters in that alleged coalition district had similar preferences at, say, the primary stage. It's not enough to say, oh, well, eventually they vote for Democrats. What if they all disagreed with each other at the primary stage? Also, are they in similar, you know, if you look at the totality of the circumstances, are they kind of similarly situated? We have almost no evidence on that. The only evidence that they put in on that actually shows that the Asian population is much more socioeconomically similar to the white population than the Latino or black population. So, basically, I think all the district court was saying there was we do not have the evidence for me to say that this, you know, is a problem under this coalition theory. But the second point I was going to make about this is plaintiffs are trying to argue that somehow it could be a violation on remedy, even if it isn't a violation on, you know, an initial liability stage claim, and that can't be right. And the reason that's not right is because there... Oh, go ahead. It can be, for example, authentically if you crack a previously black-majority district to create a new... Well, yeah, but my point is, Your Honor, I think what you would say there is actually on liability, at the liability phase. Like, if you would just start the case all over again, we could look at that and say, look, you just cracked this district. You just, you know, you violated Section 2 by doing that. But the point I'm trying to... that I was trying to make here is when plaintiffs say that there are, say, 50,000 voters in Douglas County whose Section 2 rights were not remedied, that's just false because, again, your right is not to be in a majority-black district. The right is to a particular number of compact majority-black districts, and not only is that what every Supreme Court case says on it, it has to be the case. Just as a practical matter, you can't get every black voter into a black-majority district, and you wouldn't want every black voter in a black-majority district, and that's true even if you look at this completely artificial construct of the, quote, vote dilution area that plaintiffs talk about. In the specifics of this case, it would be helpful for their partisan preferences to put all of this area into the congressional district. But it is not a generalizable rule, and in most cases, they're going to be saying, don't put these additional black voters into this black-majority district because we'd rather them be able to influence the district next to that black-majority district. So, again, from the top to the bottom, they're just trying to get around Strickland, they're trying to get around Jingles, and none of these kind of attempts at throwing different statistics out there work at all. Thank you, Your Honors. Thank you, Your Honors. I need to take some time to clarify what our argument is because I think that it has been grossly mischaracterized by my friend on the other side. And we just need to level set on what exactly we're discussing here and what is in dispute. Proposing counsel just said that our argument about the 50,000 voters who were shuffled in from outside to the exclusion of 50,000-plus voters who actually suffered the vote dilution is entirely coming from crossover districts outside the vote dilution area. That is dead wrong. We make not a single argument about crossover districts in our congressional claim. And if you read our brief, our brief is about those 50,000 voters are coming from CD5. CD5 is a majority black congressional district that lies outside of the vote dilution area. Those CD5 black voters do not have, did not have a Section 2 right to an additional majority black district. Had I brought a claim on behalf of them, I would have lost because they already lived in one. Why does their situation matter? It doesn't matter, Your Honor. The legislature is free to bring in whoever it wants to the remedial district so long as it is also fully, completely remedying the actual violation. It cannot be, as it was here, to the exclusion of a remedy of the actual people who are violated. That is a shell game. What is the right given to a voter by Section 2 of the Act? The right to what? The right to an undiluted vote that if you can establish under the three jingles preconditions and the totality of circumstances your rights have been diluted, you are entitled to a remedy. That is what the 50,000 plus black voters were entitled to after a very extensive liability ruling. And that is what the state decided not to give them. Not as a matter of one-offs, not as a matter of technicalities, but actively decided not to give them so that it could funnel in voters from a different, safe, majority black district who had no violation to speak of, all in service of dismantling minority opportunities statewide. And as I want to make extremely clear... How many voters in the vote dilution area as you describe it, were given a remedy? In other words, what's the denominator and the numerator? You say 50,000 were excluded from the remedy. How many were included in the remedy? I think ultimately what we showed is that there could have... The 50,000 number I think is coming from the fact that we have shown that there can be additional opportunities. There's an opportunity... That's not my question to you. I'm sorry, Your Honor. Maybe you can repeat it to make sure I'm exactly answering it. You say that you use the term vote dilution area, right? Yes. Okay. You say, and this is what the district court understood you to say, that the remedy could not comply with Section 2 because it excluded 50,000 voters from the vote dilution area in the remedy. Right? Yes. That's the argument, right? Yes. Okay. My question is, using the same vote dilution area, how many black voters were included in the remedy? Roughly a couple hundred... 200,000. A couple hundred thousand. Okay. So the numbers are 200,000 versus 50,000. And my argument... Yes, Your Honor. That's all I wanted to know. You can continue with the argument.  And the argument, Your Honor, is that what matters here is not the number of injured black voters excluded from a remedy, but the reason for their exclusion. Providing the remedy to different injured voters might be something, different black voters in the vote dilution area, but providing the remedy to non-injured voters, particularly in service of some political aims meant to stamp out, is not okay. But you told me that what happens to the non-affected voters doesn't matter. No, no, no. To be clear, when you are swapping, the number does not matter. And that the people who have an entitlement to a remedy, not every single black voter in a five-district, multiple hundreds of thousands of people can say, I need to be in that majority black district. That is absolutely correct. But the court, the state, cannot actively,  avoid providing a remedy to the people, to those people, to a significant number of those people, by shuffling in black voters who never had a remedy coming to them in the first place. That's exactly what LULAC said. And unlike what my opposing counsel is suggesting, the state here does not get brownie points for not being as egregious as LULAC and Shaw. The reason that the legal standard is not good enough and is instead complete,  as nearly as possible to the maximum extent, is because states who have already committed Voting Rights Act violations are notoriously good at finding new and creative ways of perpetuating that Voting Rights Act violation in one way, shape, or form. Such that half steps, baby steps, partial remedy, even mostly remedies, good enough is not good enough. A full and fair and complete and maximum extent remedy is what the law requires. Thank you very much. Thank you, Your Honors.